Good morning, Your Honor. On behalf of Mr. Steward, the appellant in this manner. As the court knows, this is our appeal of an order for forcible medication to restore competency for trial. When one looks, I believe that the hearing, which we'll call the cell hearing before the judge that held the hearing, was defective. And defective in the following ways. There were two medical reports that were presented for the hearing. One is from Dr. St. Martin, who examined Mr. Steward, who then concluded, which is on excerpt for record under cell page 18, Mr. Steward cannot be considered a dangerous patient and does not meet the legal criteria for involuntary psychiatric treatment, either as an inpatient or an outpatient. Thus, as long as Mr. Stewart does not behave dangerously and he is able to meet his daily needs, he cannot be forced to take medication and would not be considered a dangerous mental patient solely because of his writings and statements. This was followed up by the Springfield Bureau of Prisons document, which is under excerpt for record, page 27. And it concludes, after its three-month study of Mr. Stewart at Springfield, it is our opinion Mr. Stewart's prognosis is poor. He has a serious psychotic illness and he has no insight into his level of impairment or need for psychiatric treatment. Psychiatric medications are generally able to effectively treat the symptoms he displays, but he refuses to take the medicine because he is not eminently dangerous to himself or others, and because he is not gravely disabled, there does not exist a basis for forced medication to restore competency to stand trial. Are you reading from something? Yes, the excerpt for record. Yeah. Two of them. One from Dr. St. Martin, which is on page 18. And the Bureau of Prisons opinion, which is on page 27 of the excerpt for record. Well, there's two different inquiries that the court has to do. One is the Harper inquiry and one is the Sell inquiry. And the Harper inquiry is whether the person is dangerous. And so he's not. And so that's actually part of what Judge Hogan found, is that there was no basis for medication under Harper. The inquiry under Sell is a different inquiry. It's, is the person competent to stand trial, and then is there medication, is there an important enough interest to justify restoring the person to competency, and then would the medication work? And there's significant evidence in this record, first, that Mr. Stewart's not competent to stand trial. Secondly, that there are medications that would make it more likely that he would be competent to stand trial. It has nothing to do with dangerousness. And, and, and third, that there's a compelling interest. So the fact that there are doctors who say that he's not dangerous seems to me beside the point. So why, why is that wrong? Why, why is what I just said wrong? This is, this is, first of all, this is why I believe that the hearing itself is defective, the Sell hearing. And that is because when the people that testified or the doctors that testified from MDC testified as to a procedure, and the procedure was to use some psychotropic drugs that had to be administered at a different institution, either Butner in North Carolina or Springfield. They never answered the question. The government brings up in its argument, it's hypothetical. I don't believe this is hypothetical. This is a practical problem that the panel's going to have to face. And that is, how long does the psychotropic drugs last? If it's, if he's restored to competency after three, six months or whatever it takes in Springfield, the lasting effects, once that medication is, is ended or terminated in Springfield or Butner, he is brought back to Los Angeles for trial. And who knows how long the delay is. It's certainly going to be more than two, three weeks. Trial counsel, myself, who is trial counsel, will still have to speak with Mr. Springfield to prepare a defense, Mr. Stewart to, to prepare a defense. And that's going to take time. Not only that, it's the, how long it just takes to bring in the witnesses or whatever doctors that may be necessary. It's a practical matter. And the practical matter is that this panel is not faced in the Cell hearing, because Cell was restored to competency on his own. He never went through the medical treatment. And none of the cases that I've read actually discuss any of the practical effects of treating them at another location across the United States and having a trial here in Los Angeles. We're going to go right back to the same issue. Now, the other issue that was not brought up in the Cell hearing, and, and Jens Fogel mentioned it, and that is the, the government's interest. Nowhere, now, I cannot locate in any of the opinions that, a briefing of this case, what would be the effect of the sentencing guidelines as it applied to Mr. Stewart. Now, the government mentions, I believe, 31 months or that period. And Judge Hogan mentions that and, oh, well, we're not butting up to the guideline range. Well, I looked at the guidelines, and under 2A.2.3, which discusses a violation of Title 18.115, Pre-NB, Pre-N1, as well as Pre-NA, that's obstructing, I come out with a total of 6 to 12 months in custody. And Mr. Stewart's already been in two and a half years in custody. So the guideline and the calculations was never discussed at all during the Cell hearing. And when we have Hernandez-Vazquez, which I cite in my brief, in performing this, quoting from the case, in performing this fact-intensive inquiry, the district court likely approximated the analysis it would have performed had it used the sentencing guidelines as a starting point and its ultimate conclusion was sound. That is the government interest. If the government's interest to prosecute Mr. Stewart turns out that he's only going to get a sentence of 12 months and then be released, he's already been in two and a half years, and that diminishes the prosecution's need for the prosecution of this particular case. The, when we had the Cell hearing, and Dr. I believe it was Dr. Sir Vince Sinavsky, S-I-N-A-V-S-K-Y, the forensic psychiatrist, I asked him about the medical treatment if this occurs in another location. And his answer was, we have never administered involuntary medication for maintenance at MDC, Metropolitan Detention Center, during my tenure there. And he has no answer whatsoever as to what would be the practical results if we treat Mr. Stewart back there, bring him back here. Then we have the effect in the Cell hearing, because Judge Hogan totally adores the fact of applying to this individual the sentencing guidelines or the advisory sentencing guidelines as a guide. He adopts the government's representation of 31 months. I went through the record. I couldn't figure out how the government calculated 31 months on this particular case. So, and as Cell, as this Court well knows, forcible medication should only, only be ordered in rare occasions. And this is not that rare occasion. Mr. Stewart's, the subject matter of Mr. Stewart's offense, alleged offense, is that he files, made certain statements during civil filings. These aren't secret letters to Judge Matz or Judge, Magistrate Judge Parada that if you don't rule in my favor, I'm going to kill you. That's not, that's not the subject of our case. Our case is that he filed these civil ramblings, mentioning the Bible and the wrath of God would come upon him. But as the Court notes, at the conclusion of the Cell hearing, when Mr. Stewart did testify, he told Judge Hogan he understands what is happening. He understands that he is, he represents God, but he is not God himself. So, there's no question that Mr. Stewart either suffers from schizophrenia, as two psychiatrists at Springfield, and I believe Dr. St. Martin discusses, versus the, the opinion of MDC where he says, where they say that he is delusional. There's no question he has a mental disability, but I don't believe that forcible medication to restore competency to stand trial, it should be ordered in this particular case. And of course, what I'm saying is the alternative is, is dismissal of the indictment. All right. Wait, wait, wait a minute. Dismissal of the indictment? I think that is the only alternative in a case like this without, if, if a defendant cannot be restored to competency, I believe reading. Oh, because he's not competent to stand trial. Correct. Okay. Yes. I think that's the only remedy. Thank you. And I'll reserve my 46 seconds. Oh, you owe us 48 seconds. We won't collect. Excuse me. To read over that doctor's report, I, I, I thought I heard a misuse of the word. You know, imminent or eminent. I'll rely on the written report. No. Well, I just wondered about my hearing. That's right. Okay. Go ahead. May I please the court, David Elkatz on behalf of the Atelier of the United States. Your Honor, this case, this appeal, raises only two issues, one of which is really moot at this point and not right for appeal. The primary issue that it raises is whether or not the district court ruling found sufficient cause based upon the seriousness of the offense and the government's interest in prosecution to order that the defendant be involuntarily medicated. What is it? What is the seriousness of the offense? I'm sorry, Your Honor? What is the seriousness of the offense? Seriousness of the offense is making death threats to federal judges. And these threats were sufficiently, of sufficient concern, as it says in one of the pleadings in the record, that Judge Max drew several parallels between this, these threats that he received and those of another case about a year, a year and a half ago in Chicago's husband and mother were killed by a pro se plaintiff who was suing the government for malpractice by a VA or government hospital. I know about that. Okay. So there were the parallels. I tell you, the next time I get these threats, I'll send them to you because the government never seemed to be very much concerned about threats to judges. Well, they were sufficiently concerned in this case that we did bring this case. So and I think that there was sufficient basis in this case. Also, it is unusual, perhaps, in that Judge Max had serious enough concerns that he took steps to protect his family. And so this was a case that was a little bit out of the ordinary. And there was sufficient, I think, reason for him to take this quite seriously. Now, Judge Hogan, after a four- to five-hour cell hearing, made a meticulous record. Well, I think district judges are more valuable to the country than circuit judges. Like the Court of Appeals? Yeah. Okay. Well, see, Judge Fragerson was a district judge. He would think that way. I was not a district judge. I get bodyguards all the time. I had full employment for the marshal service. Now that I've been a circuit judge, they tell me to call 911. Well, in this case, it was also unusual in the sense that after the first threats were made in the initial pleading in early October of 2006, the FBI agents went out to Mr. Hogan and interviewed him at some length over a period of two hours. They got a lot of detail from him about what his intentions were, that he did intend to influence and sway the judges, he did intend for a different outcome in his case, and he did understand that this was going to create fear on behalf of Judge Max and Judge Parada. But despite that, despite having met with the FBI and been interviewed about this incident and being suggested that this was not such a smart idea for him to be doing, to say the least, he subsequently, two weeks later, filed another pleading in which he made some of the same threats. And then against Judge Parada, if he did not, that Judge Max's life was in his hands because if he did not then to change his verdict in that case, that he also would decide. Judge Max gave him a very generous verdict against the government, right? I would agree with you. $75,000. I would agree, but apparently Mr. Stewart thought that he should get $20 million, and he was quite sufficiently upset that he made these comments. So since we already have, I believe, it has not been challenged that there was sufficient basis medically to provide Mr., to return him to competency through psychotropic drugs. The question was, as it was posed in U.S. v. Evans, and that's a Fourth Circuit case, is whether or not these special circumstances or unusual circumstances in this case warrant or overshadow or over-outweigh the serious interest of the government. Well, let's say that, and I was, I understand the seriousness of the matter. But I want to ask you this. Let's say he doesn't get those, that medication. That doesn't mean that he's released. No, Your Honor. No. I mean, he may be in custody for the next whatever it is. If he hasn't given that medication, he may never be restored to where he can, you know, assist his counsel in his defense. Well, I'm not sure whether that's the case, Your Honor, because that would result presumably in some kind of a civil commitment. Yeah, yeah. And the civil commitment, as was said by one of the psychologists from Springfield, that their basis for holding him civilly is whether or not he's a danger to himself or others or unable to care for himself. And they did not feel that in this case that those factors were present to rise to the level of a full civil commitment that was indefinite and that they would be restricted. Well, can I follow up? Because I think Judge Gregerson has identified the one practical concern I have here. Mr. Stewart has served most of the time that he ever could serve, even if he were tried and convicted. And I think the evidence is pretty clear that he could not be civilly committed based on his current state. So the interest in trying him, in restoring him to competency and trying him, that's what I'm trying to pin down. The seriousness of the crime I have no problem with. I think Judge Hogan gave very detailed findings about that. But with regard to the what does the government gain by having a trial as opposed to Mr. Stewart simply being held for as long as he could constitutionally be held, which as I understand it is the maximum sentence for the offense. He could be held without trial if he's incompetent up to that point, and then he has to be let go. I made a mistake in my brief when I said the maximum sentence was six years. It is actually ten years. All right. So he could be in custody for ten years without trial, theoretically, if he's not medicated. So the government's interest in restoring him to competence for trial and trying him, and that's what I'm, apart from the seriousness of the crime, but from a practical standpoint, what is the public interest in? I think this is what Judge Gregerson's question was getting to. What do we gain from having the trial? Well, I think what we gain is a vindication of the system that we have. To simply short-circuit it by saying, well, he's already served whatever time he may ultimately get, even if he's convicted, or maybe if he's civilly committed, I think is really not the point. I think the point is to follow through with the system of justice that we have and resolve it with either a guilty verdict, a not guilty verdict, or a not guilty by reason of insanity verdict. And then at least we have gone through the steps that we need to, and it's put forth in the Constitution. And I think that that's all right. I was wondering, it seemed to be what Mr. Standler was saying, that if Mr. Stewart is medicated away from here and he gets himself able to then go through a trial. And everybody seems to agree that that would probably occur, that he would be able to go through a trial. And he comes out here to go through the trial, and these delays occur. And I think Mr. Standler indicated there was no indication of what might be done to maintain his stability during that period of time, or would we just have to wait and see when the effects of the medication terminate, and he relapses then into being unable to stand trial. Your Honor, I believe that that was actually addressed at the cell hearing. And what's the answer to that? Well, the answer was from both Dr. Sinasti and Dr. Iley, that normally this drug would last at least one month. And probably two, three, four to six months, it would still be in his system and still act to keep him competent. Now, in this situation, it's a little bit unusual because we have a case in L.A., we have a judge from Oregon, and myself in San Diego, Mr. Standler in L.A. So there would not be a trial situation until this was set in stone so that everybody would appear on the same date, and that all contingencies were taken care of so that Mr. Stewart could be returned with sufficient time, of course, for Mr. Standler to meet with him and prepare for trial, which I wouldn't think would be more than perhaps a week, and then go right to trial. And I wouldn't anticipate a trial would last more than a week at the most. So I think it's unlikely that this would ever get to the point where the drugs would have worn off, and then he would have to be returned. Now, it's also possible, as Dr. Sinasky said, that if they could find a doctor locally, whether through BOP or elsewhere, who would be willing to administer the drugs pursuant to the court order, that the drug could be readministered, another dose given to carry him another month or two or three while he was in Los Angeles. But that is an unlikely scenario, I think, and it could be dealt with when the time comes. But I think that there's clearly testimony in the record that supports the fact that this would last for at least one month, possibly even up to a year, I believe Dr. Sinasky stated. I thought they stated that I read that there really would be no problem to maintain his stability out here on the West Coast. You just have to plan ahead. I'm sorry? You just have to plan ahead. No, okay. You just have to plan ahead. I think that's what the record indicates. Yes. It would clearly require a lot of planning ahead of time to make sure that there was not that problem. Yeah, well, there'd be doctors here that could administer. Absolutely. They just need that time to get it all to work. And I would also think that we would plan ahead of time to try to find a doctor who would be available if that was necessary and on call, so to speak, so that we could have those drugs administered again. I mean, the dosage is normally, as I recall, about every two weeks, possibly one week if the two-week dosage did not work. So, you know, we have a very large window, I think, within which to have the trial occur. Well, you could fly a doctor out from Springfield. Yes. Marshals fly people all the time. All the time, yeah. They have a whole fleet of planes. I understand the service is pretty good on them. Except in the scenario with the fugitives. Yeah. Unless the court has any other questions. Thank you. All right, thank you. Rebuttal. Well, not to be the advocate of forcible medication for Mr. Stewart, and if the court is leaning towards affirming the order of forcible medication for Mr. Stewart, there is an alternative to this. And as the doctor said, the percentage is 70% that the psychotropic drugs would assist Mr. Stewart. There's 30% that it won't, and that's in the record, too. The other, I'm not suggesting this because I am advocating for my client. Yeah. But the alternative is to actually move the trial to the location of the hospital of the Bureau of Prisons in that district. Yeah. Okay. delusional status. We're going to start all over within this trial. Well, I haven't researched this, but let's say that he is never restored to a state of mental competence. Does that then, does it follow from that, that when the period in time, the time in custody exceeds the statutory maximum, that your client would just be allowed to leave the prison? I believe so. According to Springfield, their group of psychologists and psychiatrists, medical doctors, came to that exact conclusion, that he's not a danger to himself or to the community, he would be released. Yeah, but let's say after whatever the period is, six years, 10 years, three years, that he's considered a danger to himself or the community or to the judiciary, whatever you want to call it, and say he remains that way the rest of his life, and he doesn't want medication. I have a, I don't represent this individual, but this is. I think they can keep him there a long, long time. To get a civil commitment. Well, this is what it would be in Los Angeles County. There's the public guardian, and that's out of Division or Department 95, I believe. No, I think. Mental health department. Yeah, I think here we keep them in there a long, long time, and they're kept in the same facility or building where people who have been found guilty, not guilty by reason of insanity are kept. If by the time they reach that statutory maximum, they're not ready to be released. They can just be kept there. They're entitled to a hearing, I think, every year, and they can be kept there for a long, long time. You know anything about that? No. Yeah, well, I think we had a case on that a number of years ago.
judges: Canby, Leavy, Pregerson